UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| KENETHA VERGE, | ) |
| | ) |
| Plaintiff, | ) Case No. 3:08-1230 |
| | ) Judge Trauger |
| v. | ) |
| | ) |
| CITY OF MURFREESBORO, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

Pending before the court is the defendants' Motion for Summary Judgment (Docket No. 22) and the plaintiff's Motion for Leave to Amend (Docket No. 19). For the reasons discussed herein, the defendants' motion will be granted, the plaintiff's motion will be denied, and this case will be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the arrest of Kenetha Verge in a Wal-Mart parking lot in Murfreesboro, Tennessee in the early morning hours of October 20, 2008.[1] Initially, the plaintiff sued the City of Murfreesboro, Murfreesboro Police Chief Glenn Chrisman, Officer Brad Hobbs, and an unknown officer, "John Doe." (Docket No. 1 Ex. 1 at 5.) Hobbs and "Doe" are accused

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 23, 30, 31 and 35) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

1

of actually making the unlawful arrest. (*Id.* at 9-10.) Through her Motion for Leave to Amend, noted above, the plaintiff seeks to identify the John Doe defendant as Officer Trevor Young and also seeks to add Sergeant Allen Cox, who was also on the scene at the time of the incident, as a defendant. (Docket No. 19.)

In the hours leading up to the arrest, the plaintiff, her cousin, Catrina Bowen, and Ms. Bowen's three children, ages 5, 2, and eight months, had been visiting with friends and family in Murfreesboro, taking photographs, and running errands. To get around, they had been using a Cadillac that Verge had borrowed from Ms. Bowen's mother, Cynthia Johnson. Verge had been driving the Cadillac, as Ms. Bowen did not have a driver's license. (Docket No. 22 Ex. 6 at 66.)

As a final stop for the night, Verge drove to a Wal-Mart SuperCenter to drop off the pictures that she had taken for development. According to footage from the Wal-Mart parking lot taken by Wal-Mart's security camera, Verge pulled into a parking space in the parking lot at 12:19:25 a.m. on the morning of the October 20th. At this point, Verge was in the driver's seat, Bowen was in the passenger's seat, and Bowen's three children were asleep in the back seat. At 12:20:17, a woman who, all parties agree, is Verge, leaves the car, headed into the store, and she is out of view of the security camera by 12:20:34. (Docket No. 27.) The parties agree that Verge took the keys to the Cadillac with her when she went into the store. (Docket No. 22 Ex. 4 at 66.) At this time, the temperature was roughly 41 degrees Fahrenheit.

At 12:20:48, the surveillance tape shows a woman who, all parties agree, is Ms. Bowen, exiting the car. (Docket No. 27.) She appears to briefly open a rear door of the car (perhaps speaking to the children in the backseat) before closing all doors and heading toward the store at 12:21:00. (*Id.*) At this point, the three children, all under age 5, were alone in the car. Shortly

2

thereafter, a passerby noticed the children alone in the car and called the police. Officers Hobbs, Young, and Anthony Skok were dispatched, and the first police car arrived on the scene at 12:32:30. (*Id.*) Hobbs spoke with the complainant at the scene, and she reported that she had been watching the car with unattended children inside of it for at least ten minutes before the police arrived. At this time, the officers ran the plate on the Cadillac, and they identified Ms. Johnson and her husband as the owners of the car. One of the officers went into the store and had a Wal-Mart representative page Ms. Johnson and her husband, informing them that they needed to return to their vehicle. Bowen and Verge heard the page, understood that there had to be a problem related to the car that Verge had been driving, and they exited the store – Bowen first at around 12:39:00, with Verge following less than a minute later. (Docket No. 27.)

It is not entirely clear how much of this 18-19 minute period Verge and Bowen spent together inside of the Wal-Mart. As noted above, the security camera shows Bowen exiting the car within seconds after Verge exited the car, and, on the tape, as she is approaching the store, Bowen appears to be possibly be waving in the direction that Verge was headed, as if calling for Verge's attention. (Docket No. 27.) In her deposition, Verge stated that, shortly after entering the Wal-Mart store, she turned around and observed that Bowen was also in the store. The parties agree that, at this time, Verge admonished Bowen to "get back out there with [her] kids." However, at her deposition, Bowen testified that, after giving this admonishment, Verge said that, as Bowen was already in the store, Bowen should go ahead and get the items that she needed, as long as she could do so quickly. (Docket No. 22 Ex. 5 at 24.) Then, Verge left Bowen at the front of the store and headed toward the photo department, which is located in the back of the store.

It took Verge a few minutes to get back to the photo department and another few minutes to transact her business in the photo department. Bowen did not return to the car, but, as she testified in her deposition, she headed toward the baby supply section to get diapers and formula. (Docket No. 22 Ex. 5 at 24-34.) Bowen recalls that, after she left the baby supply section, she headed to the photo department, where she met up with Verge. (*Id.*) At that point, Verge and Bowen, together, made their way from the camera section in the back of the store toward the cash registers in the front of the store. (*Id.*) As they approached the front of the store, they stopped at a candy display, where Verge considered purchasing some candy, before deciding against it. (*Id.*) Around this time, Verge and Bowen heard the page regarding their vehicle over the public address system, and they quickly exited the store and went outside to meet the police.[2]

At this point, the officers on the scene (Hobbs, Young, and Skok) began an investigation of the incident, speaking with both Verge and Hobbs independently, along with the complaining witness. During the course of this investigation, Sergeant Cox arrived on the scene as well. (Docket No. 31 Ex. 4 at 16.) After speaking to all parties involved, the officers gained what both parties appear to recognize as a fair impression of the incident – that is, that Verge left the vehicle first, taking the keys to the car, and, shortly thereafter, Bowen left the car as well, leaving the children in the car; Verge and Bowen saw each other in the store shortly thereafter and, at various times during her almost twenty-minute visit to Wal-Mart, Verge understood that Bowen was in the store as well, even if she did not approve of that. (Docket No. 22 Ex. 6 at 10-11.) That is,

---

[2] While Verge had significantly more difficulty remembering the facts of the incident than Bowen did, Verge also stated that she noticed Bowen still in the store after Verge completed her business at the photo department, and Verge recognized that it was unsafe for both her and Bowen to be in the store while the young children were still in the car. (Docket No. 22 Ex. 4 at 34, 73-75.)

4

Hobbs "determined that Ms. Verge and the mother both had knowledge [that] the children were left in the car alone for approximately 15 to 20 minutes in the Walmart parking lot ... Verge had direct knowledge that the mother was with her, or she had run into the mother inside of Walmart, and she did nothing to correct the situation, to send their mother back out there or go out there herself, since she had the keys to the vehicle." (*Id.* at 4, 13.)

While, after his arrival, Sergeant Cox let the officers on the scene continue their investigation without his interference, at some point, Cox and Hobbs discussed the potential crimes with which the women could be charged. (*Id.* at 11; Docket No. 21 Ex. 1 at 21.) Hobbs wanted to charge both women with child neglect, but Cox told him that reckless endangerment would be a more appropriate charge because proof of injury to the child was required for a claim of child neglect. (*See* Docket No. 29 Ex. 6 at 43.) Cox also suggested that the women could be charged with a traffic code violation for leaving the children alone in the car.[3] (*Id.* at 25-26.)

Hobbs claims that, while all of the officers agreed that both women should be arrested, the ultimate decision to arrest was made by Sergeant Cox. (Docket No. 22 Ex. 6 at 11.) Sergeant Cox claims that he is merely a supervisor, and that, in this context, the ultimate decision to arrest

---

[3]The distinction between child neglect and reckless endangerment in this context was apparently relatively fresh in Cox's mind. In a case (known as the "Hastings" matter), which had been resolved about six months earlier, a witness had observed an unattended child in a car and called the Murfreesboro police. (*See* Docket No. 22 Ex. 7 at 27-28.) The mother of the child was charged with child neglect. (*Id.*) After the charges had been filed and the case had proceeded for some time, District Attorney General William Whitesell decided to dismiss the child neglect charge, in part because there was no evidence of injury to the child. (*Id.*) In a letter, Whitesell relayed this decision to Police Chief Chrisman, and, in the same letter, Whitesell noted that the mother could have been charged with reckless endangerment or leaving a child unattended in a motor vehicle. (*Id.*) Chrisman then disseminated and distributed Whitesell's letter to subordinate supervisors, such as Cox, in part to communicate the distinction between child neglect and reckless endangerment.

rests with patrol officers, such as officer Hobbs. (Docket No. 29 Ex. 6 at 40.) Either way, Hobbs, after the investigation and discussion discussed above, placed both Bowen and Verge in custody and drove them both to the Rutherford County Sheriff's Office, which is a few miles from the Wal-Mart. (Docket No. 22 Ex. 6 at 15-16.) A precise crime with which the women were to be charged was apparently not specified at this time. It is undisputed that, as an alternative to placing Verge in custody, Hobbs could have delayed until he got an opinion on the propriety of charging Verge from a District Attorney, the City Attorney, or the Judicial Commissioner on call that evening.

Once at the Sheriff's Department, Bowen and Verge were booked and placed in a holding cell. (*Id.*) Hobbs then went to the Judicial Commissioner's office to obtain arrest warrants for Bowen and Verge. (*Id.*) The Judicial Commissioner on duty at the time was Brittani Wright, who had been employed as a Rutherford County Judicial Commissioner since December 2007. As the defendants repeatedly point out, Ms. Wright was not, at that time, a lawyer, but she was a first-year student at Nashville School of Law.

After discussing the incident with Hobbs, Ms. Wright chose not to issue child neglect/child abuse warrants against Bowen or Verge in the absence of injury to the children. Ms. Wright did, without much hesitation, issue three reckless endangerment warrants for Bowen, but she balked at issuing any reckless endangerment warrants for Verge because Wright did not feel that Verge had any "responsibility" for the children. In the course of their brief conversation regarding charges against Verge, Wright also suggested to Hobbs that, if she issued a reckless endangerment warrant against Verge, the case against Verge would eventually be thrown out of court. After Wright impressed on Hobbs the difficulties of maintaining any charges against

6

Verge, Hobbs contacted Young and instructed Young to release Verge and to drive her home, which Young did in short order.

## ANALYSIS

The plaintiff has asserted claims under 42 U.S.C. § 1983 against two Murfreesboro police officers (Brad Hobbs and "John Doe"), the Murfreesboro Police Chief, and the City of Murfreesboro for violating her constitutional rights in conjunction with her October 20, 2008 arrest. The plaintiff also asserts a state law claim of intentional infliction of emotional distress against the individual officers and, in the alternative, a state law claim against the City of Murfreesboro for the negligent infliction of emotional distress caused by its agents. The plaintiff has also moved for leave to amend her Complaint to identify the "John Doe" officer as Trevor Young and to add Sergeant Cox as a defendant in this case. The defendants have moved for summary judgment on the plaintiff's claims and argue that, because there was no constitutional violation here, any amendment of the Complaint would be futile, and, therefore, the plaintiff's motion for leave to amend should be denied.

**I.     Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

**II.     Whether the Arrest Violated Verge's Constitutional Rights**

8

Verge's primary claim is that she was arrested without probable cause, resulting in a violation of her Fourth Amendment rights.[4] *Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003)("It is well established that any arrest without probable cause violates the Fourth Amendment.") For probable cause for an arrest to exist, the "facts and circumstances within the officer's knowledge must be sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003)(internal citation and quotation omitted). Whether "a probability of criminal activity" exists is assessed under a "reasonableness standard" that is based on a consideration of "all facts and circumstances within an officer's knowledge at the time of an arrest." *Id.* In short, "there is no precise formula for determining the existence or nonexistence of probable cause; rather, a reviewing court is to take into account the factual and practical considerations of everyday life that would lead a reasonable person to determine that there is a reasonable probability that illegality has occurred." *U.S. v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998)(internal quotation omitted).

In determining whether probable cause for an arrest existed, the key question is not whether, at the time of arrest, the arresting officer correctly and precisely identified the criminal charge that best fit the circumstances of the relevant incident; rather, the key question is whether a

---

[4] In her Complaint, the plaintiff also alleges that her Fifth and Fourteenth Amendment rights were violated by the arrest because she was "deprived of life, liberty, and the pursuit of property without due process of law." (Docket No. 1 Ex. 1 at 10.) As the plaintiff's claims are exclusively rooted in her allegedly improper arrest and detention, these claims arise exclusively under the Fourth Amendment. *See e.g. Harvey v. City of Oakland*, 2008 WL 4790785, *4 (N.D. Cal. Oct. 28, 2008)(citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

reasonable officer would have concluded that there was a reasonable "probability" of some "illegality." *See id.* As succinctly stated by the Ninth Circuit, "probable cause need only exist as to any offense that could be charged under the circumstances." *Blankenhorn v. City of Orange*, 485 F.3d 463, 473 (9th Cir. 2008). While probable cause is often a jury question, if, based on the standard discussed above, the only reasonable determination is that there was probable cause for the arrest at issue, then the court should grant summary judgment in favor of the arresting officer. *See Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000).

As discussed above, the arresting officers on the scene in this case, through their investigation, became aware of several troubling facts. One, Verge, took the keys to the Cadillac, and she left Bowen and Bowen's three young children in an unheated car, on a cold night, in a sparsely populated parking lot shortly after midnight. Two, Bowen exited the car very shortly after Verge did, and Verge, shortly after her entrance into Wal-Mart, was aware that Bowen was in the store as well. And three, neither woman did anything to correct the obvious problem that three young children were alone in a car in cold weather in the middle of the night. Instead, both women continued to shop for almost twenty minutes, only coming back outside when they were paged by the Wal-Mart public address system.

Given the nature of the conduct here, there is a very strong case that a reasonable person would conclude that both women probably engaged in some illegality. Indeed, the Tennessee reckless endangerment statute provides that "a person commits an offense who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103. As the defendants point out, given the totality of the circumstances, particularly the time of night, the age of the children, the temperature outside, the location of the

10

Cadillac, the length of time that the children were left unattended, and the fact that both individuals knew that the children were left unattended, the conclusion that both women engaged, for instance, in reckless endangerment certainly seems reasonable.[5] (Docket No. 24 at 9.)

In response, the plaintiff makes several, ultimately unavailing, arguments. First, Verge claims that she "was arrested for nothing more than merely being present at the scene of a crime" and that "she owed no legal duty to Ms. Bowen's children." (Docket No. 29 at 5.) This is, simply put, a misstatement of the undisputed facts. On the night in question, Verge was clearly at least partially responsible for the safety of the children, as she was the one operating the vehicle in which they were traveling. Moreover, she was the only one who had the keys to the vehicle, and it is undisputed that she took the keys to the vehicle when she left the car to go into the Wal-Mart. After she left the car, the children were directly dependent on Verge's return for heat and for their general safety, whether Bowen was in the car or not. Therefore, Verge was obviously responsible for the well-being of the children that night, even if she had no custodial relationship with the children.

Relatedly, the plaintiff argues that her conduct was "passive" because she "did not leave the car with the children unattended[,] she did not actively engage in conduct to leave the children

---

[5] Also, under Tennessee law, Verge could be potentially criminally liable for Bowen's conduct under an "aiding and abetting" theory of liability. *See* T.C.A. § 39-11-402(2). Tennessee courts have interpreted Section 39-11-402(2) to impose criminal responsibility for the primary offense on those who "associate [themselves] with the venture, act with knowledge that the offense is to be committed, and share in the criminal intent of the principle in the first degree." *State v. Whited*, 2006 WL 548228, *10 (Tenn. Crim. App. Mar. 7, 2006)(internal quotation omitted); *see also State v. Carson*, 950 S.W.2d 951, 955-56 (Tenn. 1997)(finding the evidence sufficient to sustain a conviction for felony reckless endangerment under an "aiding and abetting" theory of criminal responsibility).

11

alone," and she initially admonished Bowen to return to the car. (Docket No. 29 at 7.) Again, these arguments are, at least somewhat, inconsistent with the record. While, at her deposition, the plaintiff struggled to remember the details of the incident, Bowen testified that, other than this brief admonishment, the plaintiff did nothing to ensure the safety of the children – who, again, were traveling in a car for which Verge was responsible. In fact, Bowen testified that Verge encouraged Bowen to get the items that Bowen needed, and she also testified that she and Verge spent a significant amount of time in the Wal-Mart together, essentially browsing through the store, while the three children remained alone outside. (Docket No. 22 Ex. 5 at 24-34.) Again, even viewing the facts in the light most favorable to the plaintiff, the record simply does not support the notion that there was any reason for the officers to believe that Verge was a passive bystander during this incident.

The plaintiff also focuses on the fact that Hobbs, the primary arresting officer, initially wanted the plaintiff to be charged with child neglect/abuse, a charge that both Cox (on the scene) and Judicial Commissioner Wright (at the Sheriff's Department) told Hobbs was not sustainable because of the absence of evidence of physical injury. (Docket No. 29 at 8.) As discussed above, the fact that Hobbs may have initially sought an inappropriate charge against the plaintiff does not mean that probable cause was lacking. As noted above, probable cause exists when, considering the totality of the circumstances, a reasonable officer would conclude that there is a "reasonable probably" that some "illegality" has occurred. *Strickland*, 144 F.3d at 415. Simply put, Hobbs is not required to have the Tennessee criminal code memorized, and the fact that he was initially mistaken about the most appropriate charge does not bear on the general validity of his probable

12

cause determination.[6]

Finally, the plaintiff also focuses on the fact that Judicial Commissioner Wright "found that probable cause was absent" and, therefore, a "reasonable jury could do the same." (Docket No. 29 at 1.) While it is true that Wright declined to issue a criminal warrant for Verge for reckless endangerment, Wright's deposition revealed that, for whatever reason, at the time of her conversation with Hobbs at the Sheriff's Department, she had a relatively poor understanding of the relevant events. For instance, Wright testified that she "didn't even know if [Verge] knew the children were left unattended in the car," that she had no idea of the "timeline" of events, that Verge had the keys to the Cadillac (and therefore the car was not heated or running), or that Verge and Bowen had been together for some time in the store. (Docket No. 22 Ex. 9 at 31-35.) Wright went so far as to speculate that, if she had known these facts, her decision on the reckless endangerment warrant would have been different. (*Id.* at 35-36.)

Based on the record before the court, there is only one reasonable conclusion; that is, the arresting officers, most notably officer Hobbs, had probable cause to arrest Verge. They had every reason to be believe that Verge and Bowen had, at least for some time, been shopping together, and they knew that, despite having the keys to the car, Verge had knowingly allowed three young children, who were at least partially under her custody, to remain alone in a parking

---

[6] The plaintiff also repeatedly refers to the Whitehall letter in the *Hastings* matter, discussed above. (Docket No. 29 at 7.) The plaintiff argues that, because that case dealt with the propriety of reckless endangerment charges against a *mother* who left a child unattended in an automobile, it should have been clear to the arresting officers that "a clearly defined legal relationship" is necessary before one can be charged with reckless endangerment in this context. (*Id.*) The Whitehall letter states that reckless endangerment is an appropriate charge when a child is left unattended in an automobile; there is simply nothing in the letter that indicates that Whitehall is of the opinion that such a charge is limited to those in a "clearly defined legal relationship" with the child left unattended. (Docket No. 22 Ex. 7 at 27-28.)

13

lot in the middle of a cold night for approximately twenty minutes. While a reasonable officer might not – at that moment – have been able to correctly and precisely identify the most apt charge for this conduct, a reasonable officer would conclude that Verge and Bowen had engaged in some illegality. Therefore, summary judgment for the arresting officers is appropriate.[7]

### III. Claims Against Chrisman and the City of Murfreesboro

#### A. Chrisman

As noted above, the plaintiff also asserts a claim of supervisory liability against Police Chief Chrisman. (Docket No. 1 Ex. 1.) It is well settled that a Section 1983 claim against a supervisor cannot be based on a *respondeat superior* theory of liability. *Petty v. Franklin County*, 478 F.3d 341, 349 (6th Cir. 2007). Rather, to impose individual liability against a supervisor, "at a minimum, a Section 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Petty v. Franklin County*, 478 F.3d 341, 349 (6th Cir. 2007).

Here, as noted above, there was no constitutional violation, and, therefore, there can be no supervisory liability. *See id.* Moreover, as the plaintiff does not challenge in her response, there is no evidence that Chrisman had any direct connection to this incident whatsoever. As Chrisman testified in his deposition, he was not even aware of the incident until he was served with the

---

[7]Because the court concludes that Verge's arrest was not a violation of her constitutional rights, it is not necessary to consider the arresting officers' alternative claim that, even if there was a constitutional violation, they would be entitled to qualified immunity. (Docket No. 24 at 13.) It is worth noting, however, that, in this context, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Scott v. Clay County*, 205 F.3d 867, 873 (6th Cir. 2000). Here, there is no evidence of incompetence or intentional violation of law, and, therefore, even if the facts raised a legitimate question as to a constitutional violation, qualified immunity would shield the arresting officers from liability.

14

lawsuit in this case. (Docket No. 22 Ex. 7 at 15-16.) Therefore, the claims against Chrisman will be dismissed.

B.     City of Murfreesboro

Like a Section 1983 claim against a supervisor, it is well settled that a Section 1983 claim against a municipality cannot be based on a *respondeat superior* theory of liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). That said, if it is shown that a municipality's failure to train its employees appropriately has created a "policy or custom" that violates federally protected rights, then the municipality can be held liable for Section 1983 violations. *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994).

The claim here is premised on the Whitehall letter, as the plaintiff argues that the Murfreesboro Police Department ignored the allegedly clear message of that letter, which is "an adult who was only remotely associated with children unattended in a car is not necessarily guilty of a crime, and [] an arrest in such a situation may well be unconstitutional." (Docket No 29 at 10.) In light of the agreement between Sergeant Cox and Officer Hobbs that the plaintiff should be arrested, the plaintiff argues that "it is apparent that the City of Murfreesboro enforces its own set of values regarding children being left unattended in vehicles without consideration of the requirements of criminal statutes or the constitutional rights of the adults who are arrested." (*Id.*)

First, a prerequisite to municipal liability under Section 1983 is an underlying constitutional violation by the arresting officers. *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007). As the court finds that there was no underlying violation in this case, this claim against the City of Murfreesboro is not sustainable. Moreover, even if an underlying constitutional violation had been found, the plaintiff's entire premise is flawed. In his letter, District Attorney

15

General Whitehall simply made no reference to any pre-existing relationship between the adult and the child that must exist prior to reckless endangerment charges being appropriate. Therefore, there is no evidence that the City of Murfreesboro instituted a "policy" or "custom" in contravention of Whitehall's direction as far as unattended children are concerned. Rather, all of the evidence indicates that the officers on the scene made a conclusion, based on their experience and common sense, as to whether the facts of this incident warranted an arrest. Therefore, the claims against the City of Murfreesboro will be dismissed.

**IV.    State Law Claims**

As noted above, the plaintiff has also asserted state law claims of negligent infliction of emotional distress (NIED) and intentional infliction of emotional distress (IIED) against the arresting officers in this case. The federal claim in this case, the Section 1983 claim, will be dismissed, and, therefore, the court declines to exercise supplemental jurisdiction over these state law claims.

A federal district court "may decline to exercise supplemental jurisdiction ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). District courts are generally considered to have broad discretion over whether to dismiss a state law claim in this instance. *See Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir. 1997); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). That said, given the "constitutional and prudential limits on the use of federal judicial power," the "balance of considerations" (considerations including judicial economy, convenience, fairness, and comity) for the district court will usually point "to dismissing the state law claims" in a federal question case in which no federal cause of action remains. *Musson*, 89 F.3d at 1254-

55; *see also Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991) (finding that "overwhelming interests in judicial economy" should be in play before the district court exercises its discretion to decide a pendant state court claim after the federal claim has been dismissed pre-trial.)

The Tennessee Governmental Tort Liability Act (TGTLA) T.C.A. § 29-20-101, *et seq.* provides an additional compelling basis to decline jurisdiction. Under Tennessee law, state law claims against a governmental entity, such as the plaintiff's NIED claim against the City of Murfreesboro, must be brought in strict compliance with the TGTLA. The TGTLA vests "exclusive original jurisdiction" over TGTLA actions in the state circuit courts. T.C.A. § 29-20-307. The Tennessee legislature's professed interest in having TGTLA litigation in Tennessee state courts, combined with the absence of a federal claim in this court, clearly dictates that the state law claims should be dismissed.

## V.     Motion for Leave to Amend the Complaint

As noted above, the plaintiff moved for leave to amend her Complaint to clarify that the "John Doe" defendant is Officer Young and to name Sergeant Cox as a defendant, primarily alleging that he failed to train the officers under his command. (Docket No. 19 Ex. 1 at 2.) Motions for such leave should be "freely" granted when "justice so requires." Fed. R. Civ. P. 15(a)(2). That said, a court may deny a motion for leave to amend when the amendment would be futile. *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 458 (6th Cir. 2001). Here, such an amendment would clearly be futile. As discussed in detail above, the court concludes that, as a matter of law, no constitutional violation took place, and, therefore, amending the complaint to clarify that officer Young is the John Doe defendant and to add claims against Sergeant Cox

17

(which, to be viable, would require an underlying constitutional violation) would be futile. Therefore, the plaintiff's motion for leave to amend will be denied.

## CONCLUSION

For the reasons discussed herein, the defendants' Motion for Summary Judgment will be granted; that is, the court will dismiss the plaintiff's Section 1983 claims on the merits and decline to exercise supplemental jurisdiction over the remaining state law claims. The plaintiff's Motion for Leave to Amend will be denied as futile.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge